Take your time setting up. I'm going to call the second case but come up and start whenever you're completely ready. Our next case is number 23-12511 Raquel Camps et al. versus Roberto Guillermo Bravo. Mr. Slade. Whenever the court's ready. I'm ready. May it please the court. Your Honor, Roger Slade. My partner Steve Davis here for Roberto Guillermo Bravo. Before you launch into the argument, and I'll give you extra time tacked on so you can answer this question, we have a motion to supplement the record. It seems to me that the expert report, and I speak only for myself, it seems to me that the expert report of the plaintiff's expert is in the record and it was provided to the district court at some time during the trial and the parties referred to it looked at it or whatever. I don't think there's a need to supplement the record as to the report. Whatever effect we give it or consideration is another question but it's in the record. The real fight, it seems to me, is about the exhibits to that report. I would agree with that. But those exhibits were never introduced or put in the record by anybody, either at the summary judgment or during any evidentiary fights or during the trial. Why should we supplement with those exhibits now? They were supposed to be, obviously, when the report was given. But they nobody used them. Nobody talked about their content. Well, they talked plenty about Dr. Pregliasco's report. Yes. And the subject matter was discussed and that is a very important issue in this case, exactly what was created by that report, when it was created, and whether the plaintiffs in this case were justified in relying upon it. So yeah, I think that... But this equitable tolling issue was decided. We know that there were some procedural hiccups but the equitable tolling issue gets decided on evidence that is partly based on a full-blown trial on the merits. Correct. If anybody thought that the district court had made a mistake in submitting the issue of equitable tolling for the jury and that the court had to decide equitable tolling for itself and that those exhibits to the plaintiff's expert report were important to the equitable tolling issue, why wouldn't a party have put them into the record at some point? They should have put them into the record. There's no question. Why should we? And they didn't. So why should we supplement? We should supplement because in fairness, the report makes reference to them. It's like filing a complaint without the exhibits. You can file a complaint without the exhibits. Well, not really. Yes, you can. Well, the truth of the matter is... It's up to the defendant to say, you referred to our contract but you didn't attach a copy of the contract. Here's the contract. It's their report. And their report attached exhibits. And the report itself does make reference to the exhibits. So can the court decide this case without the exhibits? Yeah, so here's how we can. I mean, isn't the question here whether there was enough evidence in the record, whatever standard of review you were going to apply, I think it's probably de novo, but is it, you know, you look at the evidence in the record and you decide whether the equitable tolling decision from the district court was correct or incorrect. Why do we have to add evidence to the record? Why isn't the question just you look at the record that's there? Well, you can look at the record that's there and you should look at the records there. We're looking to belt and suspender this thing to make sure that there's no doubt that these folks knew exactly what evidence was available to them in 2008. I mean, it's their burden to prove the right to equitable tolling, right? Exactly right, Your Honor. So the absence of evidence in the record doesn't feel like it would cut against them because it's their burden to prove. Well, that's a very good point. We just want to have a complete record. You just think that those exhibits help you more than it helps them. You have that right, Your Honor, I do. And I think somebody would have put them into the record. I mean, an expert doesn't have to attach to his or her report the things that he or she relies on. Most experts do because it makes the report more credible. It allows for more transparency. There's no hiding the ball as to where the opinions came from and you can see the data sources from which the opinion was drawn. I grant you all of that. But an expert doesn't have to form an opinion based only on it on what otherwise would be admissible evidence and so parties can choose to introduce or not introduce the exhibits the expert relied upon. You're right, Your Honor. It's their burden. And with the burden that they didn't establish in this case, and I can move on to the next subject if you want. You can stop for a second. Stephanie, give him back four minutes, please. You can go into your substantive argument. My substantive argument, Your Honor, is that this case presents the longest case of equitable tolling for Torture Victim Protection Act case that we were able to find in the United States. This action occurred in 1972 and our client... You're exaggerating a bit on the length of the equitable tolling because the TVPA was enacted when? 1992. It has a statute of limitation of 10 years. That's correct. So you could have brought for a for for a an event that occurred pre TVPA, you could have brought the action in 2011, right? You could have brought the action in 2011. So the equitable tolling is not 40 years. Well, when you go back and you look retroactively tonight to 1972. You're not tolling all that period because there was no statute in place at the time. Well, there were limitations hadn't expired. Well, there was an alien Tort Claims Act. This is not an alien tort statute case. It is because they it's not because they had the right to rely upon the TVPA after that. Right. If not, the bottom line is the event took place in 1972. But you can't equitable you can't my suggestion is that you can't refer to this as a 40-year equitable tolling because that's not legally accurate. Okay, so how about 12 years? That's accurate. Okay, from 2008 to 2020 and I think our briefs make clear that that's the measuring point. But what the trial or district court did here that we think was error was they hung their hat the judge hung her hat on the conclusion of a criminal trial and a foreign jurisdiction to determine when the statute of limitations should commence to run when all the evidence you agree that there was just so we can get to the heart of the issue. Do you agree that some equitable tolling was permitted under our precedence? Yes, up until 2008. Okay. All right. So then the real the real fight is between 2008 going forward. That's correct. Okay. That's exactly correct. So this criminal trial in Argentina was not against the defendant in this correct that you're and the reason for that is we put in the papers because they don't to try defendants in absentia. These are other parties. And what and just correct me if I'm wrong but I read the district court's order many times and I can't find anything in the district court's order where the district court actually identified any specific evidence that came out of that criminal trial where you had to wait till the end of the trial to get the evidence. Am I right about that? You are 100% right about that and that's exactly what I was going to say. You beat me to it. I mean what was in what was in that trial that they didn't have? There was a building there, right, which is where this event took place, had moved since 1972. Mr. Pregliasco, Dr. Pregliasco did his report, started in 2006, started and concluded in 2008. It was part of the criminal trial in 2008. Okay. They had everything that they needed to know by 2008 and that that is exactly the point. And the important thing too if you look at this court's precedent you'll see that the cases tend to center around a certain concept. Deliberate concealment, not present here. The judge found in the trial court Mr. Bravo did not hide himself. There was no affirmative misconduct. Mr. Bravo did not engage in any action after 1972 which would cause the court to say that this action should be equitably told and after 2008 the government of Argentina was not involved in that either. If you if you look at the TVPA cases that this court and the other courts around the United States have articulated they center upon a common theme and the theme is something bad is happening in the home country. And and there was things that were happening bad in the home country but that gets those things were done before 2008. We had a lot of testimony and a lot of trial work about all the bad things in Argentina before 2008 but after 2008 remember that the Argentine government basically was restored to democracy in 1983. That was quite a while ago and there was no reason for fear after 2005. Bottom line is that these folks just waited and waited and waited. There was nothing coming out of that criminal trial. What limitations period was equitably told or should have been equitably told through at least the first extradition attempt on Mr. Bravo? I don't think there's a connection between those things and the reason for that is if you're going to bring a lawsuit here in the United States it actually helps you to have the defendant be here. The courts are open. The courts were not closed. I don't there's no connection between the extradition. Let's assume they extradited him to Argentina. Is that somehow going to help their equitable tolling or the prosecution of their claims? It's going to hurt them. Yeah, because now the defendant's not here. He's not earning money. They can't prosecute the claim. Mr. Bravo, I would presume, is not solvent to pay a judgment that was entered against him, right? That's a fair assessment. If he's extradited to Argentina, if the extradition proceeding had resulted differently, how would that have impacted the equitable tolling analysis? It would have added equitable tolling time, right? Because then he's not here. So do you fact, and I'm not saying that's a winning argument for them, but do you consider that argument differently than you do the criminal trial against the other individuals that was undergoing in Argentina? I don't think an extradition to Argentina is going to change this case one way or the other. Whether Mr. Bravo is in a jail cell in Argentina or he's living in North Miami, I think you could still file your TBPA claim here. There was no reason for them to wait to bring him back to Argentina unless what their objective was was to file claims in Argentina. Maybe that would have helped them then, but there was no connection. I think originally they thought that they were blind, but that wasn't an argument, really. Ultimately, at the end of the day, that's not what they hung their hat on. They hung their hat on, and by the way, I think the court will see the record that there was an ever-evolving change of equitable tolling theories that we had to contend with as the trial started, which frankly, this issue that the judge raised in her order, and that gets back to the issue of the exhibits, at the end of 2012, they didn't argue that. They argued up until the time period, basically 2010. This was a whole new issue. Your point on the exhibits is that had you known you had to defeat this theory of equitable tolling, you would have introduced those exhibits to do it, but you had no reason until the judge just kind of came up with this kind of on her own after the trial. I don't think I could have said that better than you just said it right now. The extradition request wasn't denied until 2020. Am I right about that? No, Your Honor. There were two of them. Okay. They've come back twice. I didn't know that you could do this, but you can have two extradition requests. They had one in 2010, and then a subsequent one, which is more recent. I don't remember the date exactly, but they've come back twice to extradite Mr. Bravo to Argentina. Both times, the Southern District of Florida denied those requests. When did the first extradition request end? It ended in a denial after a trial on the merits in front of Magistrate Dubey, in which he found that the government, basically the government of Argentina, their evidence was shaky and questionable. They also found that it was a political issue. When did that end? When did that trial and the denial of extradition occur with the first request? In 2010. That was an argument made below for equitable tolling, was it not? It was made, but ultimately not really argued. I mean, it was argued, but ultimately, Judge Lewis did not hang her head on that. I know that, but that argument was, you say that the other argument about the evidence from the criminal trials in Argentina was not really pressed below, and that the judge basically came up with that on her own, but the extradition argument was presented below, right? It was presented below, and we argued against that, and the argument, basically, is that extradition has nothing to do with whether you can file a claim here. So the claim here was filed in October of 2020? That's correct. When was the first extradition request denied? What, I mean, the specific date? It was in 2010. Right. It turns out the specific date matters. Yeah, I can look at my timeline and tell you. The extradition request was made in March of 2010, and in November of 2010, it was the first one was denied. So here we have a situation, Your Honor, where our client is defending against claims for an event that happened in a foreign country in 1972, when, of course, the ability to gather evidence and conduct discovery is tremendously compromised, in a case in which the theory of equitable tolling was constantly shifted. Now, there's, this is not a case where something new would have come up, and we would have found out some incredibly new fact, and the reason is, is because all the facts that they needed to know, really, were mostly available at the beginning. This was in the newspaper. This was a subject of movies and the newspaper articles, and newspaper, basically, television news stories. From the beginning, it was well known that these family members had been shot at a military prison in Argentina by prison guards. Their bodies were exhumed for examination. The investigation had taken place earlier on. There were lawsuits. The victims had applied for and received compensation, and I know, Your Honor, and your prior opinions talks about exhaustion, and so that that wasn't an issue, but they did seek compensation. Lawsuits seeking damages were filed, and the criminal trial, Your Honor, was open to the public, and that is in Dr. Pregliasco's report, so if you wanted to know what happened, you could easily do that by attending the trial. You've got 30 more minutes to wrap up, because you're beyond your time. I don't have 30 more minutes. I have 30. I was hoping I didn't have 30 more. Thank you. Your Honor, we're asking for the, you know what we're asking, we're asking for the this to be reversed, based on the fact that the equitable tolling is completely out of whack to anything that has ever taken place in this circuit. All right, thank you very much. Okay, Mr. Krishnan. Thank you, Your Honor, and may it please the Court. Ajay Krishnan for the Plaintiff Appellees. I'd like to start on equitable tolling under the TVPA. The statute, quote, explicitly calls for consideration of all equitable tolling principles with a view toward giving justice to plaintiffs' rights. You've got an agreement by the other side, a concession, that there was a period of equitable tolling that was appropriate, and it ran through 2008, but that still doesn't get you to correct, Your Honor. You've got to focus on 2008 going forward. Thank you, Your Honor. I think I interrupted Judge Garrity. I'm sorry. Thank you, Judge Jordan. I just wanted to follow up on the same theme. You say in your brief that the trial evidence supported the district court's finding that the plaintiffs were unable to discover crucial evidence until the conclusion of the criminal trial in Argentina. What was that crucial evidence precisely, and what does the record tell us about when, again precisely when, the plaintiffs did discover it? Thank you, Your Honor. The district court judge made findings both on the cruciality of the evidence and as to when it became available. The crucial evidence was the reconstruction of the massacre site, the naval base, and this is very much like the Cabello v. Fernandez Lario case, where the 11th Circuit found there that tolling was proper until the bodies were exhumed. Here there was a crime scene, a massacre scene, that needed effectively to be exhumed. This is a case where of purported self-defense by Mr. Bravo, and their claim is that everyone agrees that in the middle of the night these prisoners were taken out of their cells and shot. And one side is saying, well, the prisoners took one of the officers guns and started shooting at them. The other side is saying, no, there was, it wasn't, there was no self-defense. We were just shot in cold blood. That side, the victim side, they're all dead. There is no one. So just to go back to the to Judge Garrity's question, so I, in my notes, I have that your expert, whose name I'm not gonna try to pronounce, Pregliasco, visited the visit the base by court order, was ordered by the court, you can visit the base in 2008. That is correct. So in 2008 the work began and Dr. Pregliasco testified at trial that he did not, he did not present his findings until 2012. So the, this was information that was in... But it's your expert though. Why, why would your expert's presentation of his findings, why, I mean, I guess I don't understand. Your expert is investigating it. Your expert gets access to the crime scene. Your expert develops theories about what happened. Why would the presentation of those theories be the date for tolling instead of your expert getting access? I mean, I can understand if the government of Argentina is denying you access to the crime scene. I get how you would get tolling through that. But it seems once you have access to the crime scene and have available all the evidence you're ever gonna have, why doesn't tolling start then? It's exactly the case that the government of Argentina had access to the crime scene and we did not have it. He was not our expert at the time. He was a government, court-appointed expert and these were the files. What he had done with the crime scene was not available for the public. These were the files of a court-appointed expert who ended up testifying in 2012 and who subsequently we used as an expert at our trial several years later. But he was not... To get to the second part of Judge Garrity's question, what did that reconstruction tell you that you didn't otherwise know before? It's a self-defense claim juxtaposed against a murder claim. Yes, so I just I want to give one piece of context about it which is that it was a physical reconstruction of the space. The naval base was not what it was in 1972. Walls had been taken down, things have been painted over, nothing was the same. So he had to physically reconstruct the space. This happened because the Argentine criminal court gave him an order that allowed him to have access. They had to clear the military, the government agency that was responsible for the massacre, from that scene. He was given access to the site, did destructive testing on the walls, on the floor, on the doors, looked for the bullet holes, and all of this is in Dr. Pregliasco's testimony and the relevant exhibits. They were docket entry 145, which is the transcript at pages 50 to 57, plaintiff's exhibits 90, 91, 95, and 97, which are in volume 16, pages 94 to 101 of Bravo's appendix, show the reconstruction work. Things had to be broken down and rebuilt. The evidence physically wasn't available and the reason why I went into this explanation that one side is saying that there was a scuffle that occurred and the other side is saying that it didn't, is that the only evidence that really goes to that issue is the analysis of where the bullet holes were. The claim was that one of the victims, Pujadas, took a gun from an officer and started shooting at the officers that ultimately ended up shooting back at them. The fact that they shot all the victims, that, everyone understood that. The question is, didn't you, wasn't there also, well, let me ask this as a background question before I get into the details. For equitable tolling purposes, do you need to have all of your best evidence or just enough evidence to get, to file a claim and get to a jury? Because you, tell me if I'm wrong, you, your clients had information that their loved ones, decedents, had been brutally murdered before the limitations period, right? That is correct. There were witness statements from survivors to that effect that they had just been gunned down. That is correct. There was a book published about what happened at the prison. Simply a recitation of some witness, what witnesses said, who are now dead, but yes. Yes, but that means that, that, that testimony was out in the public record. Yes, and so I, I just, I, I'm sorry to interrupt. Please let, finish your question. No, no, I mean, so you had all of that information, right? Right. You had the information that the government of Argentina alleged in the extradition request. The information that they alleged, correct. Why isn't that enough for you to go forward and file a claim? So the, the TVPA case law makes clear that there is a tolling doctrine for the in, for the inability to gather crucial evidence, and that's what we're talking about. And I need to make a crucial distinction between the amount of evidence and information you need to start the statute of limitations running. And. Well, the statute of limitation has an accrual rule. Yes. Theory, right? When, when, when does it, when does accrual, when did, when did this, let's start from, from first principles, when did this cause of action accrue? It would have accrued in or, in or around the early 70s. Okay, so you could have, if it accrued in the early 70s, absent tolling issues and absent when the TVPA was created, you had to file within the limitations period. Correct. So it's, so we're, we're obviously relying on tolling. And the critical point here is that the TVPA distinguishes, and it's clear from the doctrine, there's a difference between the amount of information you have, so you, you know that you have a claim that you can file, versus the ability to compile and gather evidence. And that is a separate tolling factor because the courts appreciate, and Congress ultimately appreciated, that just because you know that you have a claim doesn't mean that you're going to be able to compile the evidence to actually prove it. Just to give a simple example, if, if I was in Iran right now, and somebody got out of a prison and said, somebody told me that your brother was tortured in that prison. I saw it, I heard it directly from someone who saw it, your brother was tortured in there. Accrual has occurred. I now, now I have a claim. Maybe. You don't have to rely on a hearsay statement by somebody else. Or, or I see it. I see it, fine, but good luck proving it. Your point being, I mean, if the government of Iran is preventing you from gathering evidence, then that's, that's the extraordinary circumstance. That's exactly right. I think, I think I buy all of that. I guess my concern is, I mean, like I said, I've read this district court opinion like 15 times, and the district court just says that on October 15th, I mean, this is what the district court says, on October 15th, 2021, a court in Argentina adjudicated defendants alleged co-conspirators guilty of homicide. And then the district court says, so that's the time when the plaintiffs could discover evidence in support of their claims. And I just don't see how that has anything to do with anything. I don't think that the district court was saying, and if we're talking about the, uh, district court set the date of tolling at the, as the end of the trial in Argentina. And I can't figure out why the end of the trial in Argentina would have anything to do with anything. I believe what the district court was saying was by the time, that time we at least had Pregliasco's evidence. And, and I do want to say that, but isn't it more important, I guess, what, if the district court is based tolling on the absence of Pregliasco's evidence, why isn't the date when you had access to the evidence? And maybe the district court just doesn't address that at all. And maybe we should just remand, but I mean, the date at the end of the trial in Argentina is not the same thing as the date when you had access to the evidence. Dr. Pregliasco testified, uh, the, the transcript is docket entry 1 45 at page 46. Uh, he, he says he wasn't sure he said initially 2011 and then he said 2012 was when he presented his evidence. So it's, it's, it's in a set of page sites that are the page sites that the district court is citing to in that passage. But Dr. Pregliasco testifies to it. And I believe what the district presented as evidence in open court. That is correct. And there, and I think the, there was no clear error in the district court's implicit finding that the, the files, the secret files of a court appointed expert are not available to the public. It would be true here. If you wanted to get a prosecution experts files in a criminal case for civil discovery, good luck. You can't do it. And that's what, and so what we know is that this is when that evidence was made available. Mr. Bravo says in part that this particular theory of tolling was not one that you press below. And let me, let me address that. It was raised at multiple, multiple times. It was raised in our jury instructions, um, that were filed with the court on June 16th of 2022. They specifically had the tolling factor quote, where plaintiffs could not investigate their claims because of the circumstances in their home country and quote, as a, as a tolling factor, we cited the Cabello case and there's. That's way too vague. I mean, they can see that. I mean, that's the point. Like they can see a lot of tolling here that would be in that framework. I mean, I think the, the point that he's making is we had no idea that you were going to say the end of the criminal trial was got tolling through the end of the criminal trial based on the absence of your ability to examine this expert. I think the end of the criminal trial, exactly when tolling goes to is as an assessment for the trier of fact to make, we, we argued before the court that, you know, there were a number of tolling factors, they're overlapping. There was a lot of evidence. We didn't specifically tie every single one to. Did you, did you, let's put it, let's put it in more direct terms. Did you ever tell the district court that equitable tolling should run at least through the date when your expert disclosed his expert report to the criminal court in Argentina? Yeah, at the very least, I, I, I looked at this up this morning. I argued it in closing. Uh, this is a docket entry, one 48 pages, one 43, one 47, one 48. Uh, I argued in closing that by relying on this in country proceeding, the criminal trial, the, uh, the, uh, plaintiffs got access to the pregly ASCO evidence. That was something that was able to, that allowed them to bring their claims in the United States. So, and this was again, many months before the district court took it away from the, um, in the jury trial, I argued in the jury trial, we argued in our post trial briefing, uh, that's a docket entry one 64 at pages 13 to 16. We said, quote, plaintiffs nevertheless were unable to adequately investigate their claims until the Argentine criminal proceedings, which finally concluded in 2012 compelled the military to provide access to critical information. We list the pregly ASCO reconstruction there, and this was before the judge took it away from the jury and then offered the parties the opportunity to submit proposed findings of fact and conclusions of law where they could have raised any of the arguments that they're raising now, but didn't do so. Counsel, I just want to ask you, um, a question about what I understand to be your alternative argument. Yes. Um, as I understand it, the plaintiffs are asking this court to affirm the district court on the alternative ground of, um, reliance on domestic accountability proceedings. I realized that the district court's order, uh, explicitly declined to address that theory. But can you touch on that here? Yes. And thank you for giving me the opportunity to do so. Uh, there are two. The the the formal way of stating the tolling factor would be reasonable reliance on domestic accountability proceedings. There are two out of circuit cases. The in re South African apartheid litigation from the Southern District in New York and Jane W. V. Thomas from the Eastern District of Virginia that we cite in our brief that advance this tolling rationale, which is that the statute should be told when the plaintiffs reasonably rely on an ongoing proceeding in the home country that may provide accountability and at the very least performs the type of factual investigation that would be needed for a civil suit. And we think it would be important for the 11th Circuit to adopt that tolling factor here for two reasons. First, if the statute of limitations is running while a domestic accountability proceeding like a truth and reconciliation commission is ongoing, then you're gonna have a floodgates problem with plaintiffs rushing to file their lawsuits in the United States when they could have a domestic remedy available at home. It's contrary to what Congress advanced in the and may I continue. I realize that you can finish answering that. If you look at the House report that we cited in our brief, it's a different section than what we cited. But the Congress makes clear in the House report that it wanted TVA plaintiffs to exhaust domestic remedies before suing in the United States. They said that the exhaustion requirement quote will also avoid exposing U. S. Courts to unnecessary burdens and can be expected to encourage the development of meaningful remedies in other countries. And secondly, it doesn't make sense for a private litigant to be investigating the facts behind an atrocity when at the same time that their own government was doing that work. That was how does that differ from your argument about the report being disclosed in the criminal case? There's a tolling factor based on the inability to compile crucial evidence. That's a tolling factor. This is a separate tolling factor. In our case the fact pattern tends to align so two different tolling factors rely on the same facts. But it could be different in different cases. Here the truth and reconciliation analogy is the criminal trial? Correct. If the criminal trial is stretched out for 10 years, you'd get tolling for the 10 years? It's reasonable reliance on a domestic accountability proceeding. So I think that there's a question as to when the reliance is no longer reasonable. Here I think you could argue either November of 2010, and that's a very important date. We filed in October of 2020 realizing that November of 2010 was when extradition was first denied. So you could say either because that domestic accountability proceeding failed to get Bravo back into the country by November of 2020, that's when it was no longer reasonable to rely. Or when this crucial evidence of the reconstruction was made available, that might be another point where you might say that it was unreasonable to keep relying on the proceeding after that point. So either of those would be it. This domestic accountability proceeding factor we think would be an equally valid basis to affirm the district court's judgment. All right. Thank you very much. Thank you. Your Honor, I'll try to supplement what I said earlier, but to specifically cite the fact that extradition has been held not to be a factor in equitable tolling. And there's a case 40 FORTI 672 FSEP 1531. The analogy that's being made here today that the reconstruction of a crime scene building is the equivalent of a body buried in the ground doesn't hold water, that makes no sense because the this building was there the entire time from 1972 forward. So their position is, I think you hit on this, he says that the physical dimensions of the prison had changed dramatically since 1972. So you couldn't just go in there and take a look and see and then go back and try to figure out what happened in 1972. You had to sort of physically reconstruct the place. Well, Dr. Percliasco started his work in that regard in 2006. Okay. And that's what the that's basically what the testimony at the trial in Argentina found and their citations to the fact that Dr. Percliasco showed his report and made it available in court in Argentina on February 20th 2008. And I have citations You say that he made it available in court. Does that mean that it was publicly available or available to the criminal court? Yes, it was publicly available because Dr. Percliasco put in his report the fact that the trial in Argentina at that particular point in time was open to the public. It wasn't like a prosecutor's file where it was locked in a desk drawer. This was open to the public and and of course the court knows this was a somewhat sensational case which was reported in all the papers. People and the and the witness I'm sorry the plaintiffs testified that they attended that trial. They were there and they had an opportunity to see that. Okay. They could have certainly say they say that he disclosed his report and it became public in 2012. So tell me about the dissonance between the two claims. Well we have in Dr. Percliasco's report you can see that and the exhibits that are attached as well which is one of the reasons we wanted to make sure that they were in evidence. Remember like Judge Brasher said we didn't have this was a new theory of tolling. Opposing counsel has indicated well I argued it at my closing and I and I argued it after the fact and it was in our post trial motions. I mean obviously this is an important issue that we need to be able to prepare for which we were not able to do. So these are all these things are are in the record the blueprints are are in the record the blueprints of the of the facility basically and this is a documentary 68 exhibit number six and exhibit 31 that's all there. What does that mean that it's all there? I mean it should the testimony and the reference to the testimony about what was known at that point was all in the record of documents. Known to whom? Well known to Dr. Percliasco. Right but if he but trial. But I take I take the plaintiff's argument and I and I think I accepted that if he's a court-appointed expert and he Argentina is not a pure common law country right? Right. Okay so the judges have a type of investigative role in a criminal prosecution they're investigating magistrates right? Right. Okay so if an expert is a court-appointed expert it stands to that until the trial at least begins or something whatever he's doing to investigate on behalf of the court is not going to be made publicly available he's not going to be publishing you know weekly revisions to his report in the Daily Gazette in Buenos Aires right? I don't know the answer to that I don't know what was published in Buenos Aires but I can tell you that facility was in other words that facility was there. Had they wanted to file their claims they certainly could have hired their own expert and and gone it and made their own analysis because like you said you don't have to have a perfect case before you file a lawsuit do we have to have an accident reconstruction expert report in our pocket before we walk into the courthouse? The answer is no because we had witness statements we had we had people prepared to discuss what was in the medical records it was in the newspaper there's no question who was involved they and everybody agrees Mr. Bravo did not conceal his whereabouts he did not do anything to interfere with their ability to investigate the government Argentina did not do anything to prevent them from investigating after 2008 so if they can conduct their own investigation yeah okay Pergoliasco was appointed by the government I get that but if they can they could perform their own investigation why didn't they? Does that diligence? That's not diligence. They have to be diligent and they could have filed their claims earlier. Counsel I want to ask you too about the domestic accountability proceedings here and why from your perspective plaintiffs pursuit of remedies in Argentina should not be considered an extraordinary circumstances there's a lot of evidence in the record that some of the plaintiffs participated in the prosecution in Argentina and the TPPA explicitly contemplates that plaintiffs should exhaust domestic remedies so can you speak to that please? Sure that the case in Argentina was a criminal case they were never gonna get any money out of that okay so that is a that's a different thing and a Truth and Reconciliation Commission we spent a lot of time in the trial court arguing about what that is that is a broad-based countrywide analysis of crimes that were committed during a specific period of time this case was focused on criminal trial other people not Mr. Bravo because he could not be tried in absentia now could they take the results of the criminal trial in Argentina and can and convict him of a criminal offense I don't think so I think he would be entitled to his own separate trial and I think that regardless of what they found in Argentina in that trial against the other defendants Mr. Bravo would still be entitled to his own separate trial on the merits here in the United States particularly whether it's criminal or something else on equitable tolling and the TVPA he is still entitled to a new and different trial you can't piggyback on a proceeding that's happening in a foreign country involving other defendants where the rules are different nobody no but no one's suggesting that he'd be held criminally liable based on what happened with the co-defendants right the question I think is do you analogize the criminal proceedings against the other individuals to a truth and reconciliation type of proceeding that might in some circumstances lead to equitable tolling absolutely not okay that's the question so answer thank you this is this your argument was sort of went to that in the sense that I mean he could still be tried in Argentina today presumably if they could find a way to extradite him like there's no end the if we were to if we were to look at this criminal process as comparable to a truth and reconciliation it would just never end right it would never end and that's the problem with the way and I think your honor hit on this judge Jordan you hit on this if you allow proceedings in a foreign country to dictate the end result of the endgame of when the statute starts to run some of these things could go on for 10 20 years so if we're thinking about what's precedent in this circuit do we allow that do we allow the governments of a foreign country to control when our statute of limitations starts and ends the real issue focuses on the individual plaintiffs what did they know when did they know it when could they have filed their claims I can tell you if I was Laura I would have followed these claims a lot sooner 2008 I would have filed them and I would have figured out okay I would have gone to Argentina I would have hired my expert I would have gone into the building I would have had an accident reconstruction done I would have filed my lawsuit and I would have been ready to go instead of sitting around waiting for some trial to conclude years later and this judge basically just pick the date it's to us it seemed out of the air after the trial 2012 that that that issue never came up we that's that's the reason we wanted to supplement the record because we didn't have opportunity to address that issue into the trial look at to return to a prior question but I want to make sure I have your answer if I look at the record the plaintiff's expert will say that he publicly disclosed his report and the reconstruction of the prison in 2008 I believe that's what his report says and that's one of the reasons we wanted to supplement the record and we'd ask that the court grant this report is there it's in the record all right so okay thank you very much thank you for your time today your honor